You're on. Well, all right, so we're going to go on to case number two. Good morning. This is case number two. Okay. And it is Tyler Gutterman v. Indiana University at Bloomington. Hello, Mr. Stephens. How are you? Good morning, Your Honor. Okay, we can begin. May it please the court. Riley Stephens on behalf of plaintiff appellants. Your Honor, this case addresses the changing nature of constitutional protections in the face of changing technology. The Fourth Amendment protects students living in their dorms just as it protects Mr. Stephens. Can I ask you one? I hate to interrupt you, but time is short here. You raised a very important point in my mind, which is students living in their dorms. Are your four clients still living in the dorms at Indiana University? No, Your Honor. They don't live in the dorms anymore. That was the freshman year they did. My understanding is they have their own apartments this year. And we might need an affidavit to that effect. But do your clients, are they all still students at Indiana University? Yes, Your Honor. They are still students as of this semester. And we are happy to get you an affidavit as to where they're living currently. And when will they matriculate? I mean, um, if you mean graduate like this? When will they graduate? Because there's a major problem here with mootness, I'm sure you're aware of. If they're not students at the university and they're seeking prospective relief against the president of Indiana University, that's a problem. We just dealt with this in class a couple of weeks ago. So if they're not students any longer, that's a major problem. And if they're not living in the dorms, then all your complaint related to, we just strike all the stuff related to the dorms, right? Because the extent they're seeking prospective relief against the president of the university, and they're not living in the dorms, that stuff becomes irrelevant. Sure, Your Honor. I think there's, I think there's two issues there. The first is, yes, they are on track. My understanding is they're on track to graduate this spring. And so come this spring, we could have a mootness issue. I'd submit that we're not there yet. And so I'm happy to, you know, we can brief that or deal with that as it comes, but that it's not the case today. As to their current living arrangements, they're still students. And so they're still using their cards all around campus. And so therefore... They use it at buildings. And the other way they use it, it sounds like from the complaint, is to buy services, such as at restaurants and things like that, similar to a credit card, which they clearly voluntarily do. They could pay cash for a Coke, or they could use their Crimson card, I suspect. Sure, Your Honor. So on the poll cameras, I think under Tuggle, I think I have to say yes to that, because that's what Tuggle says, is you can put up a poll camera outside. As to, so let's see, as to whether they're using it around campus, whether or not they're using it to purchase services, obviously, obviously, yes, obviously, that is their choice. They could use the card or they could use cash. That's not true of everything they use it for, right? There's plenty of university services for which the card is the only option. Your appellate brief makes pretty clear that you are concerned about the ongoing use of the wide tracking of data across all aspects of the Plano's lives, both on and off campus. Because the brief maintains that while the search in this case intruded into the privacy of the Plano's living arrangements, the data issue is not so limited. It tracks students all across and also off campus. So do you think that this is a lion situation? Because the chances that this will happen to these students again doesn't seem to be impossible. It's a closed system, right? Of 40,000 students, these students are captive and have to use their cards to enter every building, right? Yes, Your Honor. So I think the answer is that we think, you know, it can happen again in the sense that they're still, you know, the cards are still being used. As to lions, so the university never raised lions, the corporal never addressed lions, and so it hasn't really been briefed in this case. But Judge Rovner raised a very good point, which is standing, and we have to deal with this. And if the, whether it was briefed or whether it wasn't, and whether it was raised below, and that she raises a very good point about use and use of the data. Again, I have a hard time telling from the complaint, whether the alleged injury here is the collection and retention of the data or whether the alleged injury is the accessing of the data. So the retention and the use of the data by Indiana University. So which is it? I think it's both, Your Honor, to some extent with one caveat, which is I think the fact that the data is generated may just be inevitable, but I think the fact that there is, the injury is the fact that there is no process for, that governs the accessing the data. So doesn't that create a problem for you, though, if your plaintiffs, your four plaintiffs are going to graduate May 1st, and here we are nearly March 1st. In order to get perspective relief against the President of Indiana University, you need to say that there's an immediate and real threat that Indiana University will access this data. You know, the data of your particular clients, not any students at Indiana University, your clients entering and exiting buildings at Indiana University by the time we decide the case. Sure, Your Honor. I mean, I think, I think the issue of how often or how often this happens, we actually don't know because this is on a motion to dismiss, and so we don't actually have discovery or any other evidence into how often this happens outside of our individual clients. For all I know, they only do this very rarely. For all I know, they do this regularly and check this all the time. We don't have that in the record in this case, and so that is really, to me, it's a summary judgment question in terms of how likely it is for this to recur or how often it happens. What about the fact that they entered into a contract in which they took possession of the card under the terms and conditions of the contract that allows collection and use of the data? Would that contract, do you think? I have to respectfully disagree with the last part of what you said, which is the contract never says that they can use the data for this purpose. The contract terms, which are on pages three to six of the short appendix, they say that they can use to say that the purpose of the card is to identify students. There's a catch-all that can be used for all legitimate university purposes, and essentially they have to fit what they're doing here into that catch-all of all legitimate university purposes, but nowhere in the contract does it suggest that it's going to be used for investigative purposes or for disciplinary purposes or anything like that. And you're saying that it must? We're saying it's outside the terms of what the contract says the card is for, which is identification when they arrive at the building. And what about catch-all, for heaven's sake? What's that? I'm sorry, excuse me. Catch-all? The catch-all. You said there's a catch-all. The catch-all, yes. No, so the catch-all, we would just assume that that's too vague to license this particular use, Your Honor, which we think has constitutional implications. And you can't just, you know, we have, as we say in our brief, you know, the waiver of constitutional protections requires more than a generalized catch-all at the end of the contract terms. You suggest that, you know, we've got an administrative search here, so the students are entitled to some sort of process or review before their data is used in an investigation. But the case there, Patel, those cases are arising in heavily regulated industries. Like, that was a hotel. They have compliance they've got to do. These school cases are usually in this bucket of special needs cases. So how does Patel, in this context, get you a requirement as you see it for pre-compliance review? Your Honor, we don't think the administrative search doctrine applies. They argued that, and we answered with our arguments about Patel. So we actually don't think that's what applies. That's simply our response to their argument, if you think the administrative search doctrine applies. As to the special needs doctrine, you know, I mean, if you're talking about TLO, TLO gives you reasonable suspicion, and we didn't even get that here, right? The judge's opinion below basically says that the search was reasonable, and therefore there's no problem here. It doesn't even get into whether the special needs search doctrine applies, whether the administrative search doctrine applies, whether it's probable cause or reasonable suspicion or some other standard. So basically, we haven't even gotten that far because the judge below did not even apply that analysis. So are you saying the relief that you want is just for the university to never be able to use this swipe data in investigations? Or you're not saying there needs to be a process where students can agree to that, or there can be an independent review of the need for that kind of use of the data? No, that's exactly what we're asking for. We're asking for oversight, and we haven't gone as far as whether that has to be an independent third party or whether it would be a specific department of the university. What we're saying is it needs to be more than what it is right now, which is the university disciplinary office sends an email to the IT department saying, hi, we have a health and safety reason for this data. That's all they have to say is health and safety reason. They don't have to say what it is. We're saying we need more than that. Can you explain to me how the swipe data is different from the security footage that all universities have all over campus, including in the public hallways and common rooms? It's like security cameras, your honor? Yeah. I think there's a couple differences. The first is that it's individualized to person, right? It actually shows, right? Let me correct you there. It's individualized to the card. It's even less so than the camera. It's the card. If I had your card and entered a building, all that the university would know is that your card was used to access the building. If there was a camera, as Judge Roger pointed out, the university would know that it was me that walked into the building. That's a major difference. Fair enough, your honor. I agree. It tracks the card, which is associated with a person, whether or not that person is the person holding it. But in any case, a person's identity is associated with it, right, as opposed to a generalized camera. And also, it's historical and searchable in a way that camera footage isn't, right? It's a database of access points that you can go and you can search for exact time periods and locations and also who was doing it and what they were doing. What were they purchasing, where were they going into, exactly what time, exactly what location. And so I think it has more particularized data than just a video feed of the quad or of the street or of the hallway. Can I clarify based on an earlier discussion? So the privacy interest, it dovetails with the question you were asked earlier. The privacy interest here is not so much the student's privacy interest in their dorm rooms, but their reasonable expectation of privacy in this swipe data. Is that your argument? Well, I think it's both, your honor. They have a reasonable expectation of privacy in their dorm rooms, and that's what we've argued from the beginning. We also think they have reasonable expectation of privacy in the aggregate data of their movements and their purchases around campus. I think there's both the interior of the, there's both the home interest and the interest of the aggregation of their data points around campus. Is the university allowed to have, let's say, a routine room inspection for health and safety, do you think? Yes, your honor, because those inspections are for health and safety in the sense of fire hazards or disease or that, you know, maybe there's a student who's passed out in their room or something like that. And we say that's a different interest. That's a totally different interest than the health and safety interest they're claiming in this hazing investigation. Isn't the research you complain of here a lot less intrusive than that? No one's looking into the closed door, you know, doors of a dorm room where people keep their undergarments and their diaries and their prescriptions and their love letters and old boyfriends, heaven only knows. I'm sure, your honor. I mean, I think if you look at this court's decision in Metlock is a good guide on this, which is, you know, there, I think it was Mr. Metlock, you know, he had a week's notice, right? This is normally, in fact, the RA policy was they had to give you at least 24 hours notice and he got a week's notice. He still happened to leave his illegal drugs laying around for the RA to find. So that we think that those sorts of administrative processes done by an RA are fundamentally different situation than here where you have disciplinary investigation that potentially could be expulsion. It could eventually even be criminal and referred to police. And I see I'm out of time. Unless the court has further questions. Anyone? Let me just ask a record clarification question on this record. I think Judge Kirst mentioned earlier, they could just as easily buy a Coke with their cash versus their crimson card. We don't have that information in this particular record at this motion to dismiss stage. Do we? It seems to me there are probably many services on campus where you can't use cash or even a credit card that you can only use your crimson card. Do we know this right now? No, your honor. We don't have that in the record at this moment. We don't know whether or not they can what which things except which payments. I think what is fairly in the record is that there are certain things that are not so much the payment stuff but access to printing at the library access to other services that where they do use the cards and that's not a payment process. So that wouldn't be there wouldn't be an alternative to use a credit card there. I'm going to give you of course your rebuttal time we asked you a lot of questions. Thank you, your honor. And. All right. Okay. Hello, how are you. Thank you, your honor I'm well. May it please the court plaintiffs want this case to be about a physical search of their dorm rooms. It's not. They want the crimson cards to have GPS or cell site location information technology, and they don't. They're left with a case where during the course of an investigation into whether a fraternity was hazing its freshman pledges, the university accessed limited crimson card data to confirm that those pledges, including the plaintiffs weren't the victims of hazing. Can I ask you. How is it not like the cell site issue, the cell site cases you have these towers pinging showing everywhere the cell phone is maybe not the person having the cell phone but at least the cell phone. Here you've got this crimson card, telling the university everywhere the crimson card is being swiped. Maybe not the person associated with the card but at least the card. Why is it's I guess it's carpenter, why is it not relevant here for us. Your Honor, what concerned the court and carpenter was that constant involuntary generation of the cell site location information, which enabled the government to essentially trace the steps of the defendant, by virtue of the cell phone just being on. So it was that involuntary nature that was troubling to the court here the crimson card by itself. It doesn't do anything. There's no generation of the data by the crimson card it doesn't do anything when it's just in the plaintiffs or the cardholders wallet. The only time there is the data generated is when a cardholder voluntarily uses it, and there's no use it for everything. I'm not necessarily Your Honor, they only have to use it when they voluntarily want to if they, they use it sometimes to get into, certainly as a freshman you would have to use it to get into your resident, you want to print out your term paper you have to use it. Only if you use it on certain campus printers if you have your own printer like many students do or if you live off campus, you don't have to use it there. If you have loaded money on to it and you want to use it as a debit card you can use it but if you have cash if you have your own credit card, which I assume many students do you don't have to use it there. So it's all voluntary it's, it's only those voluntary actions so it's, it's the. It's when you want to use it so we could have students that don't use it very much at all the upperclassmen don't use it very much at all once they leave the, the residence halls but it's underclassmen might use it more when they have the residence hall access into your dorm room, do they swipe to go into their individual dorm rooms. Yeah, some of the dorms do this and again, we're getting to a phase where we don't have all this information that are in the record but it's my understanding that some of the dorms have an old fashioned key. And some of the dorms are like one of the hotels where you would hold the card up to a card reader and it would swipe it, but we simply don't have the information in the record to know which of the plaintiffs may have used a swipe card and which of the plaintiffs might have had an old fashioned key to get into the dorms. It's the university's position that their use of the data was limited to looking to see if the plaintiffs were in their dorm building. At the time of a hazing episode. But this is a case asking for perspective, injunctive relief, and you argue that the use of the data was limited to looking at swipe into the building. But what would, what is there to stop the university from using it to map out a student's movements, more fully like Carpenter or Jim. Your Honor, the capabilities of the card itself, Your Honor, it's very limited to the card itself. First of all, the university only can do what the card can do. It can only look at the university property can only look to where there are certain data readers. And again, this we're only looking at, again, when was a card access when did a card. When did a person actually swipe a card, it doesn't tell what happened, other than that swipe card being accessed it doesn't tell how long a person stayed somewhere it doesn't tell. You can swipe in, but there's no swiping out. So we don't know how long a person stayed there we don't know if you went inside how long you stayed what you did when you went inside. And then also in Carpenter, the data was where the cell phone towers were paying such that it could follow the person so long as your phone was on, and the cell towers were on you could, it could follow the person, wherever. Here, the, the access is limited with the crimson card only so often as the user uses it on somebody or on the university property or somewhere where the card is accepted. So once somebody either stops using the card, or it steps off of university property, they have the university would have no idea what was going on or what that person was doing and again here. We are limited to again emotion to dismiss phase, and what was alleged in the plaintiff's complaint, what we have a where they have alleged that can I interrupt, I think on an important issue that we're talking about here, which we do we don't deal this with in the briefs which surprised me a little bit, and that issue is sovereign immunity. Okay, so I don't know where we're at on sovereign immunity the district court knocked out a huge part of the case on sovereign immunity grounds. Yeah, I got Indiana University as a defendant and she knocked out any past relief. This is a far different case if we're talking about past relief than if we're talking about perspective relief, because Mr. Stevens conceded his clients no longer live in the dorms, is a far different case if you're using data to access someone's home than if you are using the data to access buildings, and you're just seeking perspective relief, but you don't raise sovereign immunity in your brief at all. So what are we supposed to do with that, who are the proper defendants, what are the proper claims that we're supposed to decide. The only defendant left is President Witten. No, that's not what the caption, that's, that's not what the caption I'm looking at a brief that says Cameron et al versus Indiana University Bloomington and Pamela Witten in her official capacity as president of Indiana University. Now I can ask Mr. Stevens on his rebuttal if they concede that the only thing they're seeking on appeal is perspective relief, but my guess is he's going to tell me no. So what do we do with it. Well, if, if Mr. Stevens should tell you that the only claim that is left is for perspective injunctive relief against President Witten, that is the only claim that survived from the district court that's the only claim that was left that he is appealing. But what is to say that between now and the plaintiff's graduation, there won't be another investigation of the university conducts where they want to use these students or other students swipe data to conduct their disciplinary investigation. Well, Your Honor, this isn't a class action. This was plaintiffs didn't seek to certify a class. This is only these four plaintiffs. And so the relief that was requested was by these four plaintiffs alone so they if they want to see relief on behalf of the other plaintiffs that's something that somebody else would have to do what's to say their swipe data won't be used in an investigation against them by the university. Well, that would be if it is then the university is well within their rights to do so if that is something that is for a legitimate university purpose or for the health and safety of the university like was done in this instance because the plaintiffs are on notice that that can be done, especially here they have even less of a legitimate expectation of privacy than they did back when they were freshmen, Your Honor. And so that here if they the university has some sort of legitimate governmental purpose as they did when they were investigating whether the plaintiffs were the victims of a hazing incident, which the district court correctly found was a plainly legitimate purpose. Then again, the university can go ahead and and look at that data to if it's necessary and if it is for a legitimate university purpose and the policies that are in effect say that this data can be looked at it's not as if the university is there any is there you mentioned that the policy and I suspect we'll see a little bit different policy come August but there's no there's no explicit consent provision in the use of the card. Right. And if there was a specific consent provision, then we wouldn't be here at all. Right. Actually, Your Honor, the if you look at the back of the card, it says that the accepted and let me look at it. I've read it. I've read it. I've seen it. There's there's nothing though that clearly says that the by using the card, the individual it doesn't describe what the university does with the data. Now, everybody might know this, but it doesn't describe that the university collects and retains the swipe data and by using the card to enter their dorm rooms or to enter their buildings. And by the way, there's good reasons for this. And I suspect Indiana University has security cameras all up throughout the campus. And I know that the schools in Chicago do. And that's a point of pride, you know, where they talk about we have security. We keep our students safe walking home from the bars by security cameras. And I suspect Indiana University does the same. But if there was just go ahead. I'm sorry. We have to trade some some privacy interests for the safety and security. And and yes, you're on your right at the time. At the time, the university did look at this data issue. The policy did not disclose that the university could look at that. The policies have since changed and they do disclose that they can look at it. So again, for purposes of prospective injunctive relief. It's taken a little bit out of what the plaintiffs have asked for. Have these plaintiffs agreed to that policy? You know what I'm asking about is what I'm asking about is if the policy says by continuing to use the you can turn in your card if you don't want or by continuing to use the card you can send to the use and retention of the data and the plaintiffs are continuing to use their card. They don't have a case for prospective relief. And I believe it's if the you know, I believe it's the university can update the policy at I have to look at the again look at the language again, but it's as the university can continue to update the policy as Yes, in exchange for being issued the card the cardholder agrees to abide by the policies which can be updated periodically. Do you think I do you think that the catch all is what applied to these four plaintiffs catch all is a term that was applied by plaintiffs your honor. No, I don't believe it was a catch all provision, your honor. I believe this was something that was the the The plaintiffs were on notice that this was something that the university could do they would notice they were on notice that the university that the card was used to manage the services and the buildings and the facilities by the that were owned by the university. And then under the dmo one policy. Look at that your honor the dmo one policy was that We could for any sort of The safety and support the safety and security of campus resources. Yes, we could look at the policy. Yes, we could look at that data. And again, if it was for a legitimate University purpose. That's when the information can be released and it could only be released to pre cleared university Personnel and that's what happened in this instance you you argue. I think in your brief that this is an administrative search. Is that right, and the plaintiffs resist that No, your honor. That is what was kind of puzzling to me because if you actually look at the complaint. Hold on for a second. Let me just the Indian University Police Department has access to the data, just like just like the police, just like the you know if the police department has access to the data, then it's not an administrative search. It sounds to me like nobody's nobody's arguing that this is administrative search that The police department. My understanding would have to go through if they wanted the data would have to get a warrant, your honor. It's not something Where does it say that. Why, why would they have to get a warrant. If they needed that data because it's it's the university's data. Right. So they were the university. I mean, you're saying the president, the university can access the data, but the chief of police can't. I don't see anywhere where it says that I That I believe that if it is He's asking you about the school, please. Right. The Indian University Police, not the Bloomington Police Department of the Monroe County Sheriff. I'm talking about the Indiana University Police Department. I assume they're able to access the data if they're doing this, you know, part of the reason is safety and health and things like that. They may be asked to do a welfare check and they may say, hey, let's see if this person is doing their dorm. I mean, what about a missing persons report, they wouldn't get a warrant. That I'm sorry, I was confused, your honor. Yes, that is that is one of the reasons why we need to access the data quickly and be able to move quickly in case of like a well check or a missing person, something like that. Thank you for the clarification. And yes, but it sounds like both parties agree then that that takes it out of the administrative search area. Yes, yes. So we do not believe that is administrative search. And that's why I, I was very puzzled because plaintiff's complaint refers specifically to Patel twice, I believe. And so that's what when when plaintiff disavows Patel, I was, I was confused. And your honor, I do see my, my time has elapsed. May I briefly conclude You may do what you feel you need to do. Of course, I'm going to give Mr. Stevens more time. Thank you, Judge Robner. Court. The Supreme Court in this court have repeatedly stated the touchstone of the Fourth Amendment is reasonableness. Here it was entirely reasonable for IU to conduct a limited review of its business records for the legitimate purpose of investigating a complaint of hazing, of which as freshman pledges the plaintiffs would have been the victims, not the perpetrators. I respectfully requested the court affirm the district court's dismissal of plaintiff's complaint. Thank you very much. Thank you, Mr. Stevens, may I ask you, I'm going to start you off. What did Mr. Stevens asked for, let me see. You asked for two minutes, but you need more. I would like, I would like to give you five if that's all right with my sister and brother. Of course. Thank you. You know, there really have been several. Oh my gosh, very well publicized cases of crimes that were solved with the use of university swipe data. I'm thinking of that poor woman at Yale, who was murdered a few days before her wedding. Anyway, it must be that students know that the state, that, you know, that the university can use swipe data to track wrongdoing. I mean, do you think it's possible that students of this generation, your generation, I guess, do not understand that their electronic fingerprint is everywhere? I'm not sure if I'm a member of my client's generation or not. You look like it. All right. Um, but I mean, the short answer is my client. I just said this book does too. Go ahead. Um, so the short answer is that my clients didn't know they were blindsided in terms of the actual facts of what they were aware of. Now, should they have been aware that this could have been done? Perhaps if they had thought about it, I think they probably just never thought about it. And so, and so the question is, you know, and the question is not, and I take your point that we all kind of expect that there's metadata being generated by us with our various activities as we go throughout the day. I think the basic response there is yes, but that, but that doesn't, but there still is the question of what is required in order to use that data for investigative purpose, right? We all know that the, our phones create cell site location information. We know from the Supreme Court that that requires a warrant. Right. And so it's the same, same thing here. I think it's Matt. It's even if to some extent, they're aware that, you know, data can be used against them. It's a question of what are the standards for using the data in that context? What would the warrant be? What would the warrant be? Yeah. Okay. Yeah. Well, I think it would be a showing of, we think it's a probable cause. I mean, but again, we have, we don't even have a rule, you know, it's not a matter of whether or not there's court thought or usual suspicion, suspicion. We didn't get that from the district court either. So we think it should be a probable cause standard. If the court disagrees and think it's reasonable suspicion, we still think it needs to go back and be reversed because that is still more protection than what the district court gave us. Who are the defendants? The defendants? Oh, so this, so the defendants, the name defendants are the university and the president. I think what you're asking is about the sovereign immunity problem. And the answer is, I do have to concede that the district court ruled against us on sovereign immunity for damages. And so therefore, the only thing currently in the case is the prospective injunctive relief, as my friend said. So you're not appealing the district court's ruling on sovereign immunity? We did not appeal that, that specific issue. No. You know, the, Ms. Buchheit says the students don't have to use their crimson card. They could, it's only when they want to. However, this is a $40,000, 40,000 student body university. It's large. We all went to college. You could conceivably spend an entire week on campus, not off campus. Campus is your entire world. How is this not like the Naperville case where the court said, you know, a choice made by fiat is no choice at all in the context of smart meters and in people's homes? No, I think that's right, Your Honor. I think that they don't have a choice. In fact, they are required by the university to carry the card. So it's not a simple matter of could they even to this day, they have to use it for various services and they have no choice but to carry it. There are some things like payments where there may be alternative. They could use cash or a credit card, but some things they have to use the cards for. And on Naperville, I mean, I think the issue with Naperville is simply that Naperville is not any kind of investigation or disciplinary investigation or criminal anything. It's the power company trying to read the meter so they can charge their clients. Yeah, but it's the power company trying to read the meter at somebody's home in 15 minute intervals. They can tell when they took a shower. They can tell when they use the dishwasher, when they use the washing machine, what time they went to bed, what time they got up in their home. Here, you've conceded that the home has nothing to do with this case anymore. This is zero. Well, I didn't mean to concede that home has nothing to do with this. Your clients don't live in the dorms and you're only seeking perspective relief. So the dorms have nothing to do with this case anymore. I would respectfully disagree that they have nothing to do with this because they're still using the cards all around campus and including accessing dorm buildings. I see my time's expired. No, I know you want out of here, but listen, please. Oh, not at all, Your Honor. I just want to respect the court's time. Do they have to swipe to go into bathrooms? We don't have that specifically in the record, Your Honor, other than I think we may have pled that because I think my clients did tell me that there are some bathrooms that require the cards, but the motion to dismiss record is a little light on that specific detail. My understanding is yes, but I don't necessarily have that proven in the record right at the moment. And I can't remember, into the library? I believe so, Your Honor. Classroom buildings, the library, to check out books. Further check out books, I would think. Well, okay. Gosh. Well, we certainly want to thank both of you. And the case will be taken under advisement and take care of yourselves. Okay. Thank you very much, Your Honor. Thank you, Your Honor. Thank you very much.